UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                    :

ALLAN STERN,                      :
                                    :

                  Petitioner,    :

                                    :          02 Civ. 2145 (GEL)

     -against-                  :
                                    :         **OPINION AND ORDER**

DAVID MILLER,               :
                                    :

                  Respondent.   :
                                    :
---------------------------------------------------------------x

Robert N. Isseks, Esq., Middletown, New York, for petitioner.

Robert M. Morgenthau, District Attorney (Donald J. Siewert and Mark Dwyer, Assistant District Attorneys, of counsel), New York, New York, for respondent.

GERARD E. LYNCH, District Judge:

       Allan Stern, a New York State prisoner, seeks a writ of habeas corpus, challenging his conviction for murder and resulting sentence to 25 years to life in prison. The petition will be denied.

## BACKGROUND

**I.     Procedural History**

      **A.    State Court Proceedings**

       Both the underlying case and the present petition have a lengthy procedural history. In a 1989-90 trial, a jury in New York State Supreme Court, New York County, found Stern guilty of murdering his brother-in-law, Arthur Katz, nine years before. Stern appealed the conviction to the Appellate Division, raising a number of issues, questioning the sufficiency of the evidence;

the adequacy of notice under state law of tape-recorded conversations between Stern and a key witness, the cooperating accomplice Robert DaSilva; the admissibility of those recordings and of additional statements made by Stern to a jailhouse informant in light of his constitutional right to counsel; the exclusion of certain evidence offered on his behalf; the propriety of the judge's instructions on circumstantial evidence and accomplice corroboration; and the length of his sentence.

On May 4, 1992, and October 23, 1996, while Stern's direct appeal was pending, he filed with the trial court two motions to vacate his conviction pursuant to New York Criminal Procedure Law § 440.10. Stern charged that the prosecution had fabricated evidence and violated New York's Rosario rule by failing to disclose prior witness statements. See People v. Rosario, 9 N.Y.2d 286 (1961). When the § 440.10 motions were denied, Stern obtained leave to appeal the denials to the Appellate Division, and the appeals were consolidated with his direct appeal. The Appellate Division affirmed his conviction on April 18, 1996. People v. Stern, 641 N.Y.S.2d 238 (1st Dep't 1996), rejecting all of Stern's arguments. Applications for reargument, leave to appeal to the Court of Appeals, and reconsideration of the denial of leave were all denied, and Stern's direct state-court appeals came to an end, along with his first two § 440.10 motions, on October 17, 1996. See People v. Stern, 88 N.Y.2d 1072 (1996) (denying leave to appeal after reconsideration).

Stern immediately returned to the trial court with a third motion to vacate his conviction pursuant to § 440.10, charging that the prosecutor had failed to comply with his obligations under Brady v. Maryland, 373 U.S. 83 (1963), by withholding certain ballistics and serology test results and had improperly redacted certain exculpatory material from the tape recorded

2

conversations with DaSilva.  That motion was denied on December 19, 1996.  The Appellate

Division affirmed the denial on March 16, 2000.  People v. Stern, 704 N.Y.S.2d 569 (1st Dep't

2000), and leave to appeal to the Court of Appeals was denied on September 15, 2000.  People v.

Stern, 715 N.Y.S.2d 385 (2000).

Stern's next attack on his conviction, filed in June 2001, was a motion in the Appellate

Division for a writ of error coram nobis.  Stern challenged the effectiveness of the appellate

attorneys who handled his initial direct appeal, insofar as they failed to raise the alleged

ineffectiveness of his trial counsel and the redaction of the tape recordings, and allegedly waived

certain matters in connection with the application for leave to appeal to the Court of Appeals.

The Appellate Division denied this motion without opinion on March 12, 2002.  People v. Stern,

739 N.Y.S.2d 661 (1st Dep't 2002).

### B.    The Instant Petition

Six days after denial of his coram nobis motion, Stern filed the instant petition in this

Court for a writ of habeas corpus (cited herein as "Pet."), raising two constitutional claims:

alleged Brady violations and the alleged ineffectiveness of his appellate attorneys.  The petition

was fully briefed by mid-October 2002.  While the petition was sub judice, however, Stern

moved the Court to stay proceedings on the petition to permit him to file yet another § 440.10

motion in the state court, to raise another set of claims relating to an allegedly newly-discovered

witness.

The request for a stay was granted on August 8, 2003.  Stern's fourth § 440.10 motion

was not filed in the state courts until March 2004.  That motion was denied on February 4, 2005,

and leave to appeal to the Appellate Division was denied in May 2005.  Stern then returned to

this Court, notifying the Court of the outcome of the state proceedings, and seeking permission to file a supplemental brief, adding the claims raised in those proceedings to his petition for habeas corpus.  The supplemental brief (cited herein as "Supp.") was duly filed, as was a response from the State, and a reply by Stern, and the matter was finally again fully submitted to this Court in December of 2005.

## II.    <u>Factual Background</u>

The murder victim, Arthur Katz, was the husband of Stern's sister.  Katz was an x-ray technician at a Bronx hospital and a long-time drug addict.  He was found dead of two gunshots to the head in the early morning hours of December 6, 1980, just two hours after leaving work, in lower Manhattan under the old elevated West Side Highway.  There was evidence that Stern had had an altercation with Katz at his sister's house the preceding weekend, in which Stern had injured his hand.  Stern himself, discussing this incident while being surreptitiously tape-recorded, says that he "went fucking crazy . . . [a]nd smashed all the windows and stuff."  (A. 1608.)

The principal witness against Stern was Roberto DaSilva, also known as "Bob," an informant with a number of violent deeds to his credit.  As the jury heard, DaSilva, while a member of a "death squad" (Tr. 689) in the Brazilian military, had killed and tortured political prisoners on more than one occasion.  (Tr. 494-95.)  In the United States, DaSilva beat up four of his bosses — some because of specific disagreements, and one simply because he was a "pain in the ass." (Tr. 695.)  DaSilva came forward in 1988, more than seven years after Katz's murder, and advised the police (as he later testified at trial) that he had been the intermediary who had connected Stern with the contract killers who had murdered Katz on Stern's behalf.

4

DaSilva testified that Stern had hired him to be superintendent of a West Side apartment building in early 1980. Sometime thereafter, Stern expressed a wish to have Katz beaten up. Stern disliked Katz because Katz was a drug addict, and because he was "not paying the bills." (Tr. 506.) According to DaSilva, Stern was angry because Katz had mistreated Stern's sister: "he changed the locks, and he threw my sister out of the house." (Tr. 581.) DaSilva advised Stern that he knew people who could handle such matters "in a professional way."

After many discussions in which DaSilva offered to put Stern in touch with someone who could get rid of "headaches" in a professional way, Stern asked how much it would cost. DaSilva reached out to a friend named "Richie," an ex-tenant of a building in which DaSilva once worked. "Richie" in turn recruited another man named "Sam" or "Sam Feet," who said he could hire a killer for $15,000 to $20,000. DaSilva passed this information on to Stern, who said he'd think about it. (Pet. 5-6; Tr. 507-10.)

Some time later, Stern spoke to Sam on the phone in DaSilva's presence, and made arrangements to pay for the murder of Katz. (Tr. 513-15.) Stern gave Sam an advance payment of $10,000 in DaSilva's presence (Tr. 517) — DaSilva had to chip in an extra $500 of his own when Stern's payment came up short, for which Stern later reimbursed him (Tr. 517-26) — and in late October of 1980, Sam visited Stern's office with a man known as "Crazy Joe," a professional killer based in Florida (Tr. 566), who told DaSilva that the job would soon be done. (Tr. 570.)

Sam told DaSilva to tell Stern to have an alibi on the weekend of his birthday, November 7, 1980. (Tr. 572.) On November 8, Stern called DaSilva, angry that Katz had not been murdered. (Tr. 576.) DaSilva called Sam, who told him that "we missed the guy." (Tr. 577.)

5

By December 3, Katz was still alive, and Stern called DaSilva again, this time reporting that he had had a fight with Katz — the fight in which Stern's hand was injured — and saying "I'm going to wind up doing this job . . . myself." (Tr. 579-81.)

On December 7, Stern called DaSilva to report that Katz was dead. Sam told DaSilva that he and Crazy Joe had killed Katz and "left the guy underneath[ ] the West Side Highway." (Tr. 584.) On December 9, the killers arrived at DaSilva's office to collect their money, and produced an item of jewelry taken from Katz to prove their involvement in the killing. (Tr. 586.) DaSilva called Stern, who said he would pay the rest of the money. The next day, Sam and Crazy Joe came to collect. While the killers waited in their car, drinking coffee, Vito Amato, another employee, arrived at the office with a white envelope containing their payment, went to the car, and gave it to them. (Tr. 590.)

The murder of Arthur Katz was unsolved until DaSilva reported it to the police. (Tr. 616-17.) DaSilva agreed to wear a tape recorder to meetings with Stern, and in a series of tape-recorded conversations, DaSilva, pretending to be worried that police would learn of their connection to Katz's murder, elicited a number of incriminating remarks indicating Stern's awareness of and involvement with the murder and his interest in covering it up. These tapes were played for the jury at trial. (Tr. 617-18.) Largely on the basis of the tapes and DaSilva's testimony, Stern was found guilty, and on January 29, 1990, he was sentenced to 25 years to life.

6

**DISCUSSION**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA),

> [a]n application for a writ of habeas corpus . . . shall not be granted
> with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim [ ]
> resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or [ ]
> resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d).  This opinion addresses arguments raised in Stern's 2002 habeas petition

("Pet."), and a supplement filed in 2005, that the State courts misapplied clearly established

federal law in rejecting his various arguments for a new trial, all of which are without merit.[1]

## I.    Ineffective Assistance Claims

A claim of ineffective assistance of course "necessarily invokes federal law that has been

'clearly established' by the Supreme Court within the meaning of AEDPA." Sellan v. Kuhlman,

261 F.3d 303, 309 (2d Cir. 2001).  The Supreme Court set forth the test for such claims in

Strickland v. Washington, 466 U.S. 668 (1984).  To establish ineffective assistance of counsel

under Strickland, a plaintiff must demonstrate (1) that his counsel's performance was deficient,

and (2) "that the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687.

The first component "requires showing that counsel made errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id.  The

---

[1] Stern makes various procedural arguments involving the respondent's failure to timely submit its memoranda of law and other such technicalities. (See, e.g., Supp. Reply Aff. 12/4/05, at 2.)  Although court-ordered deadlines and other such requirements are not to be taken lightly, the writ of habeas corpus exists to remedy violations of constitutional rights, and not as a sanction for technical procedural deficiencies in the State's filings.

second requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

To establish eligibility for habeas relief under AEDPA's deferential standard, a plaintiff must demonstrate that the state court's application of Strickland was not merely incorrect, but "'objectively unreasonable.'" Loliscio v. Goord, 263 F.3d 178, 184 (2d Cir. 2001), quoting Williams v. Taylor, 529 U.S. 362, 409 (2000)). An objectively unreasonable application involves "[s]ome increment of incorrectness beyond error." Sellan, 261 F.3d at 315 (internal quotation marks omitted).

Most of Stern's ineffective assistance claims pertain to the performance of his appellate counsel. "[T]he Fourteenth Amendment guarantees a criminal defendant the right to counsel on his first appeal *if the state has provided such an appeal as of right*." Taveras v. Smith, 463 F.3d 141, 147 (2d Cir. 2006) (emphasis in original). Where a claim of ineffective assistance is based on counsel's failure to raise certain arguments, the petitioner must show that those arguments were meritorious and that there is a reasonable probability that raising them would have changed the outcome of the proceedings. See Kimmelman v. Morrison, 477 U.S. 365, 375 (1986); Mosby v. Senkowski, 470 F.3d 515 (2d Cir. 2006). Courts "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" United States v. Kurti, 427 F.3d 159, 163 (2d Cir. 2005), quoting Strickland, 466 U.S. at 689.

A.    **Juror's Exposure to Extra-Record Information**

Stern's first argument concerns remarks made by Jackie Katz, a witness at the trial and Arthur Katz's sister-in-law, which may have been overheard by one of the jurors. Stern

contends that his appellate counsel was ineffective for failing to argue that his trial counsel was ineffective in failing to demand judicial inquiry into whether the juror overheard these remarks.

The Sixth Amendment guarantees criminal defendants the right to a trial by jury, and the right to confront their accusers. U.S. Const. Amend. VI. The Supreme Court has interpreted this provision to require that the jury's verdict "be based upon the evidence developed at the trial." Irvin v. Dowd, 366 U.S. 717, 722 (1961). "A defendant's Sixth Amendment rights are therefore implicated when the jury considers incriminating evidence that was not admitted at trial." Bibbins v. Dalsheim, 21 F.3d 13, 16 (2d Cir. 1994). Stern argues that his prior counsel were ineffective for not arguing that the remarks overheard by a juror constituted prejudicial extra-record evidence.

Stern relies on a line of cases holding that "[o]n . . . direct review of federal convictions, extra-record information that becomes known to the jury is 'presumptively prejudicial.'" Bibbins, 21 F.3d at 16, quoting Remmer v. United States, 347 U.S. 227, 229 (1954). As the Second Circuit has noted, however, "review of the effect of constitutional errors on a state court conviction is more limited." Bibbins, 21 F.3d at 16. "In order to secure a writ of habeas corpus following a state-court conviction, a petitioner alleging that a trial error violated his constitutional rights must show that the error had substantial and injurious effect or influence in determining the jury's verdict." Id. (quotation marks omitted). "In other words, the petitioner must show 'actual prejudice'" flowing from the alleged error." Id.[2]

---

[2] Even in the line of cases on which Stern relies, it is not always necessary to conduct a voir dire. In another case where defendants argued "that the district court abused its discretion by not examining each juror individually," the Second Circuit noted that the defendants "mistakenly rel[ied] upon cases in which actual exposure to demonstrated prejudicial publicity required the district court to conduct an individualized voir dire of the jury." United States v.

Ms. Katz had testified that shortly before the murder, Arthur Katz had called her to say that Stern was "trying to kill [him]" and that Stern was "breaking in to [Katz's] house." (Tr. 194.) On the second day of the trial, after Ms. Katz's testimony, the following exchange took place:

> MR. KARTAGENER:  Your honor, as I was leaving the court today during the luncheon hour, as I was heading to the elevators, I was distressed to notice that Jackie Katz, who has already testified as a witness in this case[,] was standing at the elevator bank with[in] approximately four feet of juror number 11 and, in what I described as a pain face or the pained look on her face, was saying something about how people tell stories.
>
> Now, I have no idea, quite frankly, as to whether it related to the substance of this case or otherwise, and I am not seeking to have that juror voir dired right now.  But I would like – and Mr. Moscow suggested that it be done in a neutral fashion, and I don't have a problem with that – that all of the spectators who have been coming regularly be advised and cautioned –
>
> THE COURT: To keep away from the jurors.
>
> MR. KARTAGENER:  They are not to speak out in the elevators or the hallways and keep their eyes open when they are having conversations.
>
> MR. MOSCOW:  And be instructed not to take elevators with jurors.
>
> MR. KARTAGENER:   That's fine.

---

Gaggi, 811 F.2d 47, 52 (2d Cir. 1987).  Where widespread publicity created a "strong possibility" that jurors had been exposed to prejudicial material, inquiry was appropriate, id., but the circumstances of Stern's case demonstrate no such strong possibility.  As courts including the Second Circuit have emphasized, "individualized voir dire is commonly unnecessary and may sometimes actually serve to exacerbate any juror's concerns."  Colon v. Artuz, No. 98 Civ. 6368, 1999 WL 341996, at *9 n.4 (S.D.N.Y. Apr. 13, 1999), quoting United States v. de Rosario, 166 F.3d 1202 (2d Cir. 1998) (summary order).

(Tr. 528-29.)  The judge then cautioned the visitors in the courtroom as follows:

> Ladies and gentlemen who are visitors in the courtroom, at the request of both counsel — excuse me, I am talking to the visitors here.
>
> At the request of both counsel I am instructing all visitors here (a) if you see any jurors in the hallway, not to – make sure either you come in the courtroom or stay down the other end of the hallway, not to be near any jurors.
>
> Nobody is being accused of anything, but this is a caution I've been asked to give you.
>
> Second of all, when jurors step into the elevator, then you are [to] wait until the jurors will have left before stepping in.  Do not step into the same elevator.
>
> I will instruct the officers from now on that the jurors will be accompanied as a group to the elevator and go down together.  And also be met.

(Tr. 529.)  Kartagener did not assert that Ms. Katz was talking to the juror, nor that the juror heard the remark.  Nor does anything in the record suggest that Ms. Katz's remarks related to the substance of the case.  (Tr. 528.)  Thus, there is nothing in the record that suggests that the juror was actually exposed to any prejudicial extra-record information.

Even if the juror had overheard remarks by Ms. Katz, the record does not indicate that any prejudicial remark might have been made.  Ms. Katz's testimony that Stern and Katz had fought violently prior to Katz's murder was not contested by Stern at the trial; nor was her credibility at issue.  Moreover, the incident in question occurred on the second day of a homicide trial that was more than two weeks long, at which Ms. Katz was a relatively insignificant witness.  The trial judge charged the jury to confine their deliberations to the evidence at trial (Tr. 1509-10), and particularly that "[w]hatever sympathy you might have for the family of the

11

deceased, whatever sympathy you may have for Mrs. Katz, whatever sympathy you might have for anyone else in this case, that should not influence you in any way" (Id. at 1510). "[W]e presume that a jury adheres to the curative instructions of the trial court." United States v. Colombo, 909 F.2d 711, 715 (2d Cir. 1990).

Stern contends neither that any juror overheard Ms. Katz's remark nor that it was prejudicial in substance or in tone. "[A] convicted defendant should not be allowed to waste the time of a district judge or inconvenience jurors merely to conduct a fishing expedition." United States v. Moten, 582 F.2d 654, 667 (2d Cir. 1978). Moreover, the judge at trial is in a much better position to address the effect of incidents involving jurors, and to exercise discretion with respect to the need for further inquiry, than a later court reviewing his or her decision on a cold record . Accordingly, Stern has failed to show either that the trial court erred or that he suffered actual prejudice, and it was therefore not ineffective assistance for his trial or appellate counsel not to raise this issue.

### B.    Failure to Call Vito Amato

Stern's second ineffective assistance claim is based on trial counsel's failure to call Vito Amato as a witness. Amato, according to DaSilva, delivered Stern's second payment to the gunman known as Sam. (Tr. 590.) Stern points to a detective's notes from an interview with Amato in November 1988, in which Amato was asked, "Did you ever receive[ ] any money from Alan Stern to give someone for a job they had done for him?" Amato answered, "No." (Pet. 46 & Ex. E.) Amato further denied that he knew anything about Katz's death. (Id.) Based on this exchange, Stern argues that trial counsel erred in not calling Amato to deny that he had received money from Stern to pay the gunman.

12

The brief exchange recorded in the detective's notes is far from conclusive as to what Amato would have said on the stand.  As the respondent notes, nothing in the record suggests that Amato was telling the truth to the detective, or that the detective's notes were accurate. Stern does not provide an affidavit from Amato averring that he was willing to testify at trial, or indicating what he would have said if called.  Even if Amato's testimony would have matched his purported statement to police, it cannot be said that there was a reasonable probability that it would have affected the outcome of the case.  Amato's testimony would have been eminently impeachable: it came eight years after the events in question, when counsel could hardly be confident that his memory as to delivery of a particular envelope would be reliable, and Amato had obvious reasons to want to protect his employer and himself from criminal liability.

Moreover, even if Amato testified credibly that he had not made the purported delivery, the government's case would not have been substantially undermined.  Amato's testimony is relevant to whether DaSilva's memory of the crime was accurate, but only as to the relatively minor question of how the second payment was accomplished.[3]  Moreover, because the evidence at trial included not only DaSilva's testimony but Stern's own self-inculpating statements on tape; even a powerful impeachment of DaSilva's memory would have left intact a major piece of evidence that was more than sufficient to support Stern's conviction.

A lengthy and complex police investigation generates all sorts of leads, loose ends and potential avenues of investigation, and the resulting file can usually be plumbed for indications

---

[3] In fact, impeachment of DaSilva's memory as to who paid the hitman would have been consistent with the tapes, on which Stern is heard to deny having paid the hitmen via Amato. (See Stern Pet. Reply ¶ 27.)  Thus, the jury already heard evidence suggesting that Amato may not have been the person who made the payment to the hitmen.

of potentially exculpatory witnesses.  Absent affirmative evidence that the witness actually

would have testified in a helpful way, a conviction cannot be undermined years later by simply

pointing to a hearsay statement in the file suggesting that a witness once denied a peripheral fact

to the police in brief and blanket terms.  Given the risk that Amato might change his story or

prove impeachable on grounds of bias or faulty memory and the limited relevance of the

testimony, the decision not to call him was a presumptively reasonable trial strategy.

### C.    Failure to Raise the Alteration of Tapes or Transcripts of Conversations Between Stern and DaSilva

Stern argues that his first appellate counsel was ineffective for failing to raise the issue of

whether the prosecution improperly altered transcripts of tape recordings of conversations

between DaSilva and Stern, or whether the prosecutor improperly failed to play exculpatory

portions of those transcripts for the jury.

This argument was first raised in Stern's third § 440.10 motion, and was rejected by the

trial court as barred by § 440.10(3)(c) because it was not raised in either of Stern's first two

440.10 motions and by § 440.10(3)(a) because Stern failed to preserve it for direct appeal.

(Resp. Ex. 15.)  The Appellate Division affirmed, concluding that Stern's arguments were both

procedurally defective and meritless.  People v. Stern, 270 A.D.2d 118 (1st Dep't 2000).  It is

unnecessary to address whether Stern's arguments concerning the tapes and transcripts are

procedurally barred, because they are clearly without merit.

Stern claims that the transcript submitted to the jury by the prosecution was altered in a

way that made it seem more damning.  Specifically, Stern argues that after DaSilva asks, "Did

you tell anybody that we killed a guy?" Stern's response was altered in the transcript from

"Nobody knows what?"  to "Nobody else knows, what?"  (See A. 1606 (emphasis added); Pet.

14

48 n.46.)  Even if the transcript was incorrectly altered in this fashion, the resulting change is not

significant.  Stern contends that "[t]he addition of the word 'else' makes Stern sound like a party

to a secret understanding with DaSilva about the murder of Katz."  (Pet. 48 n.46.)  With or

without the word "else," however, Stern's response to DaSilva's question is itself a question that

conveys no particular information as to Stern's own knowledge.  The putatively correct version

of the transcript is not exculpatory, and the putatively altered version is not particularly

inculpatory.

In any event, this change is immaterial in light of the other statements made on the tape,

which contain ample evidence on the basis of which the jury could have concluded that Stern

knew exactly what DaSilva was talking about.  For example, when DaSilva says "just you and I

know this shit," Stern agrees, "Yeah, you and me."  (A. 1606.)  When DaSilva again asks,

"Nobody know, just you and I?"  Stern agrees: "Nobody, nobody."  (A. 1610.)  When DaSilva

says "You gave the last payment, for, to give to Sam.  You gave to Vito."  Stern says, "Nobody

knows but us."  (A. 1612.)  When DaSilva asks, "Only you and I know about this shit, right?",

Stern replies, "That's it, nobody else knows, nobody."  (A. 1620.)  Stern is also heard to tell

DaSilva to tell police that DaSilva has never heard of Arthur Katz (which would clearly be a lie,

since the entire conversation concerns Katz's murder): "Just say, I don't know nobody, I don't

know what you're talking about.  Who's Arthur?  Who's his brother-in-law?  Never heard of

them.  Understand what I'm saying?"  (A. 1625.)

The tapes also contain statements strongly suggesting that Stern knew the identity of the

killers.  Stern says, "The only way they could have anything is if they would of picked up Crazy

Joe or somebody, you know?"  (A. 1619) — a statement that appears to refute the defense's

15

theory that "there is no real Crazy Joe. " (Tr. 1005.)  Similarly, the defense's contention that

"there is no real Sam Feet" (Tr. 1005) is seemingly rebutted by Stern's response to DaSilva's

comment that "Sam won't talk": "I hope not."  (A. 1629.)  Stern does not contend that any of

these inculpatory statements were mis-transcribed.  In light of the context of the tapes, there is no

reasonable possibility that the outcome of Stern's trial or appeal would have been different had

his counsel succeeded in changing "Nobody else knows" to "Nobody knows."

Moreover, Stern's arguments concerning the transcript ignore the fact that the jury was

carefully instructed not to rely on the transcript, but rather on its own interpretation of the tapes

played in the courtroom.  The jury was told before listening to the tapes that "what you hear is

what counts, not what is written" in the transcript, and that the transcript "is not part of the

evidence.  It's the tape itself and what you hear which is the evidence in this case."  (Tr. 618.)

The same instruction was given during deliberations, when the jury was told:

> [A]gain I remind you the transcripts are not evidence.  There may
> or may not be errors there.  It's for you to determine.  The fact is
> it's what you hear that's the evidence, not what is written on these
> transcripts.  Again, they are not part of the evidence in this case.

(Tr. 1575.)  As noted above, courts must "presume that a jury adheres to the curative instructions

of the trial court."  Colombo, 909 F.2d at 715.  It is of little consequence whether the transcript

contained an error, because the jury was thoroughly warned not to rely on the transcript.

Stern also points to three portions of the taped conversations with DaSilva that were not

played for the jury and which, he contends, were exculpatory.[4]  (2002 Reply at ¶ 10-22 & Ex. E.)

---

[4] As to the question of the prosecutor's failure to play certain portions of the tape, Stern
points to no legal principle under which the prosecutor was obliged to present exculpatory
material to the jury.  Stern does not contend that the prosecution did anything to prevent Stern's
trial counsel from offering any portion of the tapes into evidence, and Stern's counsel was of

Stern claims first that the jury did not hear DaSilva's statement that hitmen had handcuffed Katz — a factual assertion that Stern argues is belied by other evidence in the record. This argument, however, was raised at trial, and the trial judge allowed the defense to elicit Dasilva's testimony that he had said in the taped conversation that the hitmen had handcuffed Katz. (Tr. 1002, 1004.) Thus, there was no possible prejudice arising from the redaction of the tapes on this point. In any event, the redacted material at most establishes only that DaSilva was confused as to the details of the murder — something that is hardly surprising, given that DaSilva's role was that of middleman, not direct participant.

Second, Stern claims that the jury should have heard a portion of the tape on which DaSilva states that the hitmen gave him a gold chain with a Star of David from Katz's body to prove they killed Katz. Stern says the prosecutor redacted this after Katz's brother testified that Katz had never owned a Star of David. Respondent concedes that DaSilva's testimony on this point was, at the very least, inconsistent, but points out that the central issue was whether a token was in fact delivered, not what sort of item it was. (Resp. 2002 Mem. 49.) Although DaSilva's inability to correctly identify the piece of jewelry delivered to Stern may have been a basis on which to impeach his ability to accurately remember the events in question, it does nothing to cast the inculpatory statements by Stern recorded on tape in a more positive light. Because

_____

course free to offer any portions of the tape he wished, so Stern's characterization of this question as one of "prosecutorial misconduct" (Pet. 49) or "tampering" with the tapes by the prosecutor (2002 Reply ¶ 11) thus seems misplaced; the issues, rather, are whether defense counsel unreasonably failed to obtain or offer exculpatory evidence, whether the government improperly failed to disclose it, and whether appellate counsel unreasonably failed to make arguments concerning these failures. However characterized, Stern's claims relating to the alteration or redaction of the tapes and transcripts are without merit, because none of the altered or redacted material was materially exculpatory.

17

Stern's own statements so strongly evidence his knowledge of and involvement in Katz's murder, it cannot be said that there is a reasonable probability that the outcome of the proceedings would have been different if Stern's counsel had argued that the taped conversation concerning the Star of David should have been offered.

Third, Stern contends that the jury was improperly denied the chance to hear a statement by Stern suggesting that Stern believed "two blacks" had killed Katz. This statement conflicted with DaSilva's statement to the police that the hitmen were white. (2002 Reply at ¶¶ 10-22 & Ex. E.) In the testimony to which Stern refers, however, Stern seems not to be discussing his own beliefs about the killers, but the statements made to him by police officers who had questioned him about the incident. After some discussion of the police's belief that the crime had been committed by drug dealers, the following exchange took place:

> Stern:  . . . [W]hen they were talking they said that two guys came up as policemen — two blacks.
>
> DaSilva:  Two blacks?
>
> Stern:  Two blacks pulled him over (Inaud).
>
> DaSilva:  Joe, he was a police lieutenant.
>
> Stern:  I know that.
>
> DaSilva:  He had the badge.
>
> Stern:  Two blacks.

(2002 Reply Ex. C at 7.)

It seems most reasonable to read this conversation as a discussion of the police's *mistaken* belief that the killers are black, in which Stern reassures DaSilva that the police are on the wrong track by pointing out that the killers are believed to have been black; DaSilva

responds by pointing out that the police are in at least one sense on the right track, because one of the killers, "Crazy Joe," did in fact pretend to be a policeman in order to pull Katz over — to which Stern repeats, comfortingly, "Two blacks." This is consistent with the general drift of the conversation, in which DaSilva pretends to be concerned about the police's investigation into the Katz murder, and Stern reassures him that the police will not be able to make out a case against them. Trial counsel can hardly be faulted for failing to raise such an unpersuasive argument, and no prejudice can be found in the failure to make it.[5]

In short, none of the arguments Stern raises relating to the tapes and transcript of his conversations with DaSilva suffice to show a reasonable probability that a different outcome would have resulted had his prior counsel raised them. Stern's contention that "I would not have been convicted but for the admission of the altered tapes" (2002 Reply ¶ 22) is utterly without support in the record.

### D.    Appellate Counsel's Failure to Raise Issues in the Application for Leave to Appeal

Stern contends that his first appellate counsel was ineffective because his application for leave to appeal to the Court of Appeals (Pet. Ex. H) did not argue (1) that the verdict was against the weight of the evidence; (2) that the Court's jury instructions were deficient on the questions of circumstantial evidence and accomplice corroboration; (3) the trial court erroneously precluded certain defense witnesses and struck certain defense witness testimony; and (4) the

---

[5] In any event, even if Stern did at one point was mistaken about the race of the killers, this would not have been deeply significant, because Stern was accused of hiring them through intermediaries, and there is little in the record to indicate that Stern ever met the killers face-to-face. It would have been highly irrational for the jury to have disregarded all of Stern's inculpatory statements regarding Katz's murder on the basis of Stern's ambiguous comments relating to the race of the killers, which is no doubt why prior counsel did not raise this issue.

prosecution's use of perjurious testimony and false evidence required reversal.  (Pet. 55.)

These contentions are without merit.  "[T]he Fourteenth Amendment guarantees a criminal defendant the right to counsel on his first appeal if the state has provided such an appeal as of right."  Taveras, 463 F.3d at 147.  Because "a criminal defendant does not have a constitutional right to counsel to pursue discretionary state appeals," his constitutional rights are not violated by ineffective assistance with such an appeal.  Wainwright v. Torna, 455 U.S. 586, 587 (1982).  Moreover, in the context of a discretionary appeal to the state's highest court, it was entirely reasonable for appellate counsel to focus on what seemed to be the strongest arguments at the time, rather than submitting a long list of points that might obscure the principal arguments.  Petitioner provides no persuasive reason to believe that any of the points he now presses offered any reasonable prospect of obtaining review in the Court of Appeals.  Accordingly, Stern's claims of ineffective assistance are without merit.

## II.     *Brady* Claim Involving the Car Found in New Jersey

Stern argues that the state courts unreasonably applied federal law when they denied his second § 440.10 motion, which claimed that the prosecution had failed to disclose exculpatory evidence as required by Brady v. Maryland, 373 U.S. 83 (1963).  (See Pet. 27-36.)  The putatively exculpatory evidence relates to a car found by police in New Jersey that may have been the car in which Katz was murdered.

Respondent argues that Stern's claim fails because the evidence in question was in the possession of the Medical Examiner's office, rather than the prosecution, and was therefore not in the government's possession for Brady purposes.  (G. Mem. 24-26.)  See People v. Washington, 86 N.Y.2d 189, 192-193 (1995) (holding that material in the Medical Examiner's

possession is not within the control of police, because the Medical Examiner is an independent, non-prosecutorial agency, and therefore that such evidence need not be disclosed by prosecutor). It is not necessary to reach this contention, however, because the evidence at issue was not so exculpatory that Stern was prejudiced by the government's failure to disclose it.

### A.    Background: The Putatively Exculpatory Evidence

Shortly after Katz was killed and his body found near the New York side of the Holland tunnel, an abandoned blue Cadillac was found in Irvington, New Jersey, a few miles from the site where Katz's body was found, with bloodstains in its interior and a spent bullet slug under the rear seat.  (Resp. Ex. 12 at 48[6]; see Pet. 22.)  The New York City police, interested in determining whether there was a connection between the abandoned, bloodstained car and the Katz murder, took samples from the car and sent them to the New York City Medical Examiner's Office for ballistics and serology testing.  (Id.)  The car found in Irvington was owned by someone named "Victor Albano," apparently a resident of Bellville, New Jersey. (Resp. Ex. 12 at 48, 51; see Pet. 24; G. Mem. 15 n.8.)  Stern's Brady claim arises from the government's failure to disclose its knowledge of this car, the results of the blood tests, and the fact that the car was owned by someone named Albano.  (Pet. 32.)  He argues that the car supports his theory that Katz was killed by drug dealers to whom Katz owed money.

It appears to be undisputed that Katz had a serious drug problem, and that he sold drugs himself.[7]  (Tr. 1245-1250.)  Indeed, Katz's involvement with narcotics was one of the many

---

[6] Because Respondent's Exhibit 12 has no page numbers, they have been added by the Court.

[7] The trial court precluded testimony on this issue by Horatio Masdeu, who worked with Katz in the radiology department of North Central Bronx Hospital.  (Tr. 1107.)  Masdeu saw

reasons for Stern's hatred of Katz. Katz's widow, Stern's sister Barbara Katz, testified that she

once found two 30 gallon bags of marijuana in their closet (Tr. 1245), that Katz was hospitalized

and treated for addiction to heroin during his wife's pregnancy (Tr. 1246), and that Katz had at

one point accidentally set their couch on fire. (Tr. 1250-51.) Katz also failed to pay his debts,

which at one point almost resulted in the bank's foreclosing on their home. (Tr. 1263-64.) Katz

also fought with his wife, at one point ripping a telephone out of the wall when she attempted to

use it. (Tr. 1269.) This was the event that triggered an altercation between Stern and Katz

shortly before Katz's murder. Stern arrived at the Katz house shortly after the phone was ripped

out of the wall and had a loud argument with Katz, which ended when Stern broke a pane of

glass on Katz's door with his fist and was rushed to the hospital. (Tr. 1271.)

Stern asserts that Katz owed money to several people for drugs, including someone

named Ray Albano. (Pet. 23.) His basis for this assertion is a statement given by Lydia Otero to

an investigator hired by Stern. (Id.) Otero, according to a police report submitted along with

Stern's third § 440.10 motion, was romantically involved with Arthur Katz, although

Otero was married to a man named Richard Vetrano. (Resp. Ex. 12 at 91.) This relationship

was corroborated by the trial testimony of defense witness Sabrina Noriega, a co-worker of

Katz's. (Tr. 1080.) The police report further stated that Otero had given birth to a child two

months before the murder, and that Katz had paid Otero's doctor. (Resp. Ex. 12 at 91.)

---

Katz on the day of his death, and would have testified that he and Katz were planning to steal
silver from the radiology department because Katz had purchased $3000 worth of drugs from
"certain Jamaicans," who were now "after him" for the money. (Tr. 1109.) The trial court
refused to admit this evidence, calling it unduly speculative and noting that "anybody could have
a motive to kill almost anybody." (Tr. 1114.)

If an angry drug dealer named Albano wanted to kill Katz, he apparently would not have been alone.  The defense at trial pursued a theory that Vetrano, Otero's angry husband, might have been the killer.  (Tr. 1085, 1096.)  Barbara Katz, testifying for the defense, stated at trial that "Richie" Vetrano had threatened to kill Katz shortly before the murder because Katz was having an affair with his wife.  (Tr. 1094-96.)  Vetrano's threat was made over the phone; a co-worker heard Katz reply, "If you want me, come and get me."  (Tr. 1097.)  Noriega, who according to the defense was testifying "against her will" (Tr. 1089) — apparently indicating an unwillingness to inculpate her husband — confirmed this account of a threat from Vetrano at trial.  (Tr. 1082.)  In addition to "If you want me, come and get me," Otero remembered Katz saying, "If you want to kill me, I'm here."  (Tr. 1093.)

Otero, herself a heroin addict, told Stern's investigator in 1989 that Katz owed money to several drug dealers and "had many enemies."  (Resp. Ex. 13.)  She claimed that this information had been conveyed to her by her husband's brother, Anthony Vetrano, who in turn had supposedly received it from his girlfriend Linda, the "best friend" of "Ray Albano's wife."  (Id.)  So at last Stern's chain of inferences arrives at Ray Albano, whom Stern now asserts is tied in some unspecified fashion to the Victor Albano who owned the Irvington car.  This is a long chain of hearsay and rumor on which to stake a theory of the defense.  Moreover, Otero's credibility would have been subject to impeachment on grounds of bias, given that her husband had threatened to kill the victim, her lover.  Nonetheless, this is the basis on which Stern asks the Court to find that the failure to disclose the existence of a bloodstained car belonging to a Victor Albano was prejudicial.

After the trial, Stern's sister (and Katz's widow) Barbara Katz commenced a proceeding pursuant to New York State's Freedom of Information Law ("FOIL"), see N.Y. Pub. Officers L. § 84 et seq., against the New York City Medical Examiner's Office, in an attempt to compel disclosure of the serology and ballistics test results.  The litigation was unsuccessful; the First Department held that Ms. Katz could not rely on FOIL because she was "essentially standing in the shoes of her brother, the convicted accomplice in [her] husband's murder," and FOIL was not available to convicted murderers attempting to obtain medical records concerning their victims. See Katz v. Scott, 236 A.D.2d 259 (1st Dep't 1997).  In the course of this litigation, however, Stern asserts that the attorney arguing the case on the City's behalf advised the trial court that the blood recovered from the Irvington car matched Katz's blood.  (Pet. 24.)  Stern submits no transcript of these proceedings, presumably because no transcript exists; instead, he relies upon affidavits from his attorney, his mother, and his wife to that effect.  (Id.)

The government contests Stern's assertion that the blood results matched.  It submits a January 25, 1995, letter from the Medical Examiner's general counsel to the District Attorney's office, asking for the prosecutor's position on Ms. Katz's FOIL request.  The letter states that "[w]hat the [Medical Examiner's Office] has in serology is raw data; the blood samples from two sources did not match and no formal report was ever written."  (Resp. Ex. 31.)  The letter attaches a form in which the police requested a comparison of Katz's blood and the blood in the Irvington car, and a chart with data marked "Biochemistry Bloodstain Analysis Results."  (Id.) Stern offers no evidence other than the hearsay statements of his attorney and his relatives to

support the contention that this letter and its supporting documentation are forged or misleading.[8]

Nothing in the record suggests any basis for the supposed assertion by the attorney from

Corporation Counsel that the blood results matched, even if that statement was indeed made at

oral argument.

Stern points to a police investigator's notesheet on which is found "Informant — Said

Ray Commit."  (P. Reply. Aff. ¶ 7 & Ex. B.)  Nearby is a date of birth and address under the

name "Vic Albano."  From this, Stern asks the Court to infer that police had been told by "an

informant at Ray Albano's gas station" that Ray Albano committed the murder.  (P. Reply Aff.

¶ 7.)  Although the defense has now known of the Irvington car for at least nine years (see Pet.

23 n.25), and the alleged connection between Katz and Ray Albano for eighteen years, Stern has

apparently been unable to find any further evidence of a connection between the Victor Albano

who owned the car and the Ray Albano who was purportedly Katz's drug connection.

### B.    Legal Analysis

There are three components of a Brady violation: "[t]he evidence at issue must be

favorable to the accused, either because it is exculpatory, or because it is impeaching; that

evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

must have ensued."  DiSimone v. Phillips, 461 F.3d 181, 192 (2d Cir. 2006), quoting Strickler v.

Greene, 527 U.S. 263, 281-82 (1999).  Brady information must be disclosed in a manner that

gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the

---

[8] Stern does suggest, in a letter sent to the Court in early 2006, that the analysis chart mistakenly identifies Katz's blood type as Type B, when in fact it was O+.  (Letter from Robert N. Isseks, Esq., to the Court, dated Jan. 19, 2006.)  Stern does not explain how he knows that the column marked "EAP" indicates blood type, but even assuming Stern is correct, a mistake in the analysis would not show that an exculpatory report existed and was withheld.

information to obtain evidence for use in the trial.  United States v. Rodriguez, 496 F.3d 221, 226 (2d Cir. 2007).  See DiSimone, 461 F.3d at 197.

To establish that the withheld evidence was material — that is, that the defendant suffered prejudice when it was withheld — the defendant must show "a reasonable probability of a different result."  United States v. Jackson, 345 F.3d 59, 73 (2d Cir. 2003) (quotation marks omitted).  A "'reasonable probability' is a probability 'sufficient to undermine confidence in the outcome.'"  United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005), quoting United States v. Bagley, 473 U.S. 667, 682 (1985).  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Kyles v. Whitley, 514 U.S. 419, 434 (1995).  Because Stern's Brady claim involving the car was adjudicated on the merits by the First Department (see Resp. Ex. 22 at 119), the writ may be granted only if the state court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

In this case, the similarity of names between the owner of the car and the putative drug dealer does nothing to undermine confidence in a verdict based largely on Stern's own inculpatory statements on tape.  Stern relies upon the claim that the owner of the car in which Katz was killed shared a last name with one of Katz's drug suppliers.  This is a tenuous link.  If it is possible to infer solely on the basis of shared names that Ray Albano of Yonkers, NY, and Victor Albano of Bellville, NJ, are the same person, it is equally possible to infer that Richie Vetrano, the angry husband of Katz's girlfriend, and "Richie," the intermediary who located

26

hitmen willing to kill Katz, are the same person, which would of course be entirely consistent with the prosecution's theory of the case.  The evidence of the Irvington car points in no particular direction.

The only evidence Stern offers that a drug dealer named Ray Albano harbored ill-will towards Katz is the statements of Katz's girlfriend, who — according to defense counsel — was highly reluctant to give testimony inculpating her husband Richie Vetrano.  Even if Ray Albano existed, the only evidence tying him to the owner of the Irvington car is a shared last name. Assuming arguendo that the Irvington car was in fact the car in which Katz was murdered,[9] it cannot be said that the Appellate Division unreasonably applied clearly established federal law when it held that the evidence relating to the car was "not exculpatory" and that it "did not contradict defendant's tape-recorded admissions that he orchestrated the murder of which he was convicted."  (Resp. Ex. 22 at 119.)

The evidence on which Stern now relies may show a possibility that several other people, including Katz's drug dealers and Richie Vetrano, had reason to want him dead.  But so did Stern, as he himself admitted; on the tape recordings, he laughs about having told the police that "somebody else beat me to it."[10]  (A. 1607.)  Stern's own words made clear to the jury that regardless of who else might have been involved in the killing, Stern himself unquestionably was.  The jury heard Stern on tape discussing his involvement in the murder of Arthur Katz, his

---

[9]  Of course, the only evidence tying the car to Katz's death is the hearsay statements of Stern's attorney and relatives that Corporation Counsel once made such an assertion in court.

[10]  Indeed, Stern's lawyer at the time testified when Stern called to report that Katz had been found dead, the "[f]irst thing I said to him was, Allan, did you have anything to do with this?"  (Tr. 244.)

concern that the police might make contact with the contract killers, and his ideas about how DaSilva might help him keep secret their involvement in the murder. The state court did not unreasonably apply <u>Brady</u> in deciding that there was no probability that the outcome of the state court proceedings would have been different had Stern had access to the police reports concerning the Irvington car.

**III.    Claims Involving "Richie," The Alleged Intermediary**

Stern makes several arguments concerning the individual known as "Richie" who, according to DaSilva, was asked by DaSilva to connect Stern to a contract killer, and who eventually did put Stern in touch with the killer identified as "Sam." (Tr. 48-49.) Stern's 2002 petition and his 2005 supplement to the petition have different ideas as to the identity of "Richie." The 2002 petition argues that his prior counsel was ineffective for failing to call one Richard Cannizzo as a witness to testify that he was not the "Richie" in question, while the 2005 supplement argues that "Richie" is Richard Fricano, and that the government violated its <u>Brady</u> obligations by failing to disclose its knowledge of Fricano to Stern prior to his trial. Stern also argues that recent statements by DaSilva in a television interview demonstrate that the government failed to disclose material evidence concerning "Richie," and that DaSilva's trial testimony was perjurious.

**A.    Ineffective Assistance Claim Relating to Richard Cannizzo**

Attached to Stern's 2002 petition is an affidavit dated December 22, 2001, from one Richard Cannizzo, stating that he does not know anyone by the name of Roberto DaSilva or Bob DaSilva and that he was never interviewed by the New York City Police Department about his knowledge or participation in any crime that occurred in 1980. (Pet. Ex. I.) DaSilva testified at

trial that "Richie" was an ex-tenant at 2121 Shore Parkway, where DaSilva had been employed. (Tr. 507.)

Stern contends in his 2002 petition that "there seems to be no doubt that the supposed contact man, Richard Cannizzo, did exist and resided at 279 Carroll Street, Apartment 3." (Pet. 51.) As evidence for this claim, Stern cites to police notepad entries on which Richard Cannizzo's name, address and phone number appear. (Resp. Ex. 29 at 27-30.[11]) Stern argues that "[t]here is no mention of any other Richard in any of the police reports, which suggests that Richard Cannizzo must be the Richie that DaSilva testified about." (Pet. Reply ¶ 31.) This, of course, is not true; the fact that the police notes mention no other Richie merely suggests that the police were unaware of any other Richie.

The police did in fact investigate the possibility that Richard Cannizzo was the "Richie" who served as DaSilva's link to "Sam." Police reports indicate that "[t]he confidential informant" (presumably DaSilva) "had previously mentioned that Sam's wife was named Anita," and that DaSilva told police he contacted Sam by calling a certain phone number in Brooklyn. (Resp. Ex. 29 at 31.) Following up this lead, police discovered that the phone number was listed to Richard Cannizzo at 279 Carroll Street, 3rd Floor, an apartment occupied by Rose Cannizzo. (Resp. Ex. 29 at 31.) Rose Cannizzo was Richard Cannizzo's mother. (2002 Pet. Ex. I ¶ 7 (Richard Cannizzo Aff.).)

Rose Cannizzo told police that her husband's name was Salvatore Cannizzo, and that he died in approximately 1984. (Resp. Ex. 29 at 31.) She said he was not known by the name Sam

---

[11] Because Respondent's Exhibit 29 has no page numbers, these page numbers were added by the Court.

"nor did she know of anyone named Sam."  (Id.)  Her name, of course, was not Anita.  Thus,

nothing in the record available to Stern's prior counsel suggested in any reliable way that

Richard Cannizzo was connected to the events in question.[12]  It was not error to fail to call a

witness who was, to all appearances, irrelevant to the proceedings.

New evidence does suggest a somewhat stronger connection between Cannizzo, DaSilva,

and "Sam Feet."  Although the 2001 affidavit by Richard Cannizzo states, "I never heard of

Crazy Joe," it contradicts his mother on the question of Sam's identity: "My father was known as

Sam Feet."  (2002 Pet. Ex. I.)  Richard Cannizzo's statement that his father was known as Sam

Feet might have been relevant at the trial, because it could have been interpreted as evidence that

someone known as Sam Feet was indeed connected to DaSilva via someone named "Richie."

(While relevant, the statement would hardly have been helpful to Stern, because it tends to

support the government's contention that "Richie" and "Sam Feet" actually existed.)  Although

the theory that Richard and Salvatore Cannizzo were "Richie" and "Sam Feet" conflicts with

parts of DaSilva's account — Richard Cannizzo did not live at 2121 Shore Parkway, and

Salvatore Cannizzo's wife was not named Anita — further support for the theory that Salvatore

Cannizzo was Sam Feet is apparently provided by DaSilva's statements in his television

interview that "Sam Feat [sic] passed away."  (2005 Aff. Ex. A. at 06:25.)

Nothing in the record, however, indicates that Stern's prior counsel, or the police or

prosecutors, had any reason to suspect, prior to 2001, that Salvatore Cannizzo was known as

Sam Feet.  Stern has therefore not shown any basis for his claim of ineffective assistance.

---

[12] In a 2002 television interview, Richard Cannizzo denied even knowing DaSilva, and
said that the police had never questioned him about the murder.  (Stern 2005 Reply Aff. at 7 n.5,
citing telecast transcript p. 2.)

Moreover, Stern cannot argue that he was prejudiced by his prior counsel's failure to discover that the Cannizzos were "Richie" and "Sam," because, as discussed in the following section, he now claims that "Richie" was someone else entirely.

### B.    *Brady* Claim Involving Evidence Relating to Richard Fricano

Stern's contention that there is "no doubt" that Cannizzo is the "Richie" referenced by DaSilva has apparently now been abandoned, because Stern has a new theory as to the identity of "Richie."  In his 2005 supplement to the habeas petition, Stern contends that "Richie" is one Richard A. Fricano.  (Supp. 4.)  As evidence for his second theory as to the identity of "Richie," Stern submits an affidavit from Fricano which asserts that Fricano lived at one time at 2121 Shore Parkway.  (Supp. Ex. B.)  Fricano further asserts that he recalls a Brazilian superintendent named Bob.  (Id.)  Fricano denies, not surprisingly, that he was ever contacted by DaSilva regarding the murder of Arthur Katz.  (Id.)  Stern's 2005 supplement argues that the government violated his right to due process by failing to disclose material exculpatory evidence within its possession that related to Fricano.[13]  See Brady v. Maryland, 373 U.S. 83 (1963).

The evidence relating to Fricano is not exculpatory, and Stern cannot show that he was prejudiced when it was not provided.  Nothing in the materials Stern submits establishes that Fricano was in fact the "Richie" to whom DaSilva's testimony referred.  Stern relies on notes taken by police in which the phrase "Bar & Grill" appears close to the name "Richard," and points out Fricano once owned a bar.  (Id.)  Another police note reads, "Rich – BRF Moving Bklyn."  Fricano once owned BRF Moving Company.  (Id.)  While these connections seem to

---

[13] It is not necessary to reach the government's argument that this claim is procedurally barred, because it is without merit.

establish that police investigated the possibility that Fricano was the "Richie" who aided in the murder, nothing in the notes suggests that the police concluded he was in fact "Richie."[14]  At best, Stern's submissions may establish that one of the former residents of 2121 Shore Parkway, a possible "Richie," denies participation in the murder, but that hardly establishes that no such "Richie" existed or played the role attributed to him by DaSilva.  Testimony by Fricano, if believed by the jury, could have established only that a former resident of 2121 Shore Parkway named Richard knew nothing about the events in question.

The jury was well aware that the government had not identified "Richie" or "Sam," so the fact that any particular individual named Richard was not "Richie" refutes none of the prosecution's evidence and adds nothing to the evidence considered by the jury.  Nor was the identity of "Richie" — or even his existence — an important part of the government's case against Stern.  "Richie" was not alleged to have been the gunman; DaSilva arranged the contract between Stern and the killer, and "Sam" or "Sam Feet," along with "Crazy Joe," was alleged to have committed the act.  Because nothing connected Fricano to the events in question, and because the jury knew that the government had failed to identify "Richie," failure to disclose the fact that a man named Richard once lived at 2121 Shore Parkway was not a <u>Brady</u> violation.

Stern's 2005 supplement also argues that the prosecution's failure to disclose relevant information concerning "Richie" is demonstrated by a March 6, 2003, interview with DaSilva conducted by a television news reporter named Sarah Wallace.  In the interview, DaSilva

---

[14] Stern notes that DaSilva stated during his television interview that he met "Richie" at a warehouse, and that BRF Moving owned a warehouse.  (2005 Reply at 4.)  Even if the police were aware of this fact, it is not a sufficient basis on which to conclude that Fricano was "Richie."

appears not to know the last name of the man identified as "Richie," saying "I don't know if it is Cannizzo. I don't know which Richie you are trying to locate." (Supp. 6-7.) DaSilva then states that "the investigators" did in fact locate "Richie,"and "they wired me to talk to him. To find Sammy the [F]eet." (Supp. 6.) He further claims that "Sam the Feet" was not produced at trial because "the investigators found out that Sam had passed away." (Supp. Ex. B. at 20:19.) These statements are vague; in context, it is not entirely clear that DaSilva knows who the reporter is talking about. Even if the statements are interpreted in the way most favorable to Stern, however, they do not establish that the government withheld material evidence.

Stern argues that DaSilva's television interview statements demonstrate that "the police would have known who Richie was, along with his last name and address" (Supp. 7), and that the government therefore withheld exculpatory evidence — specifically, contact information for "Richie" and tapes that were made when DaSilva conversed with "Richie" while wearing a wire. Stern speculates that the supposed tapes of DaSilva's interview with "Richie" would have demonstrated that "Richard Fricano is the 'Richie' referred to in the prosecution's case at trial and that he had nothing to do with Katz's murder." (2005 Reply at ¶ 8.) This contention is incoherent. The only way Fricano could be the "Richie" referred to at trial is if he put Stern in contact with a hitman, because "Richie" was identified at trial with few characteristics other than his having served in that capacity. If the tapes show that Fricano did connect Stern to a hitman, then they are of course not exculpatory; if they show that he did not, then the tapes do not establish that Fricano was "Richie."[15]

---

[15] For this reason, the request for a subpoena directing the production of these supposed tapes, which Stern makes in his supplemental petition, is denied. (Supp. 16.)

Moreover, DaSilva's statements to a television news reporter fifteen years after the investigation in question are not reliable. They are unsworn and unsubstantiated by any of the police notes turned over to Stern.[16] DaSilva's statements are also inconsistent with the Fricano affidavit on which Stern relies, because that affidavit states that neither the police nor DaSilva ever contacted Fricano regarding Arthur Katz — a contention that appears to refute Stern's claim that Fricano is "Richie" and that the police discovered this by interviewing and taping him him. (Supp. Ex. B.) DaSilva's statements to the news reporter are therefore insufficient to show that the prosecutor knowingly used perjured testimony.

**C. Due Process Claim Regarding DaSilva's Testimony About "Richie"**

Stern also argues that DaSilva's statements in the television interview demonstrate that the prosecution knowingly relied on perjured testimony at trial, in violation of his right to due process. "[A] habeas petitioner seeking relief on the ground of a recantation of allegedly perjured testimony establishes a due process violation by showing that the prosecutor knowingly used perjured testimony." Sanders v. Sullivan, 863 F.2d 218, 222 (2d Cir. 1988) (quotation marks omitted). Specifically, Stern contends that the various government witnesses who testified that they did not know the identity of "Richie" were lying, as was DaSilva in his testimony about "Richie." As discussed above, however, DaSilva's vague, unsworn statements

[16] Stern contends that police notes support his theory that Richard Fricano was secretly recorded, but the notes he cites, which are largely illegible, do not appear to contain any such indication. (Supp. Ex. C.)

to a television reporter long after the events in question are far from sufficient to establish that "Richie" was ever identified by the police. Accordingly, this contention is without merit.[17]

## CONCLUSION

Because Stern's claims are without merit, his petition for a writ of habeas corpus is denied. As Stern has not made a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue.

SO ORDERED.

Dated:    New York, New York
          October 1, 2007

GERARD E. LYNCH
United States District Judge

---

[17] Stern also argues that when DaSilva stated to the television reporter, "I don't know who did it or not," he meant to imply that he did not know whether Stern was guilty. This is clearly a misreading of the transcript, in which DaSilva explains only that he was not present at the actual murder, so he was unaware at the time of whether it had been committed or who pulled the trigger. (Supp. Ex. A. At Tr. 23:37-23:40.)